**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Diners Club International Limited,<br><br>  Plaintiff,<br><br>vs.<br><br>privatedinersclubportal.co.uk,<br><br>  Defendant. | No. CV-24-01559-PHX-SPL<br><br>**ORDER** |

Before the Court is Plaintiff's Motion for Default Judgment (Doc. 13). For the following reasons, the Court concludes that the Motion must be denied.

**I.    BACKGROUND**

On June 26, 2024, Plaintiff Diners Club International Limited ("Plaintiff" or "Diners Club") filed a Complaint against Defendant, infringing domain name "privatedinersclubportal.co.uk" ("Defendant"). (Doc. 1). The action was brought under the *in rem* provisions of the Anticybersquatting[1] Consumer Protection Act, 15 U.S.C. § 1125(d) (the "ACPA"), and the action arises out of alleged violations of the ACPA and the Lanham Act. (Doc. 1 ¶ 2).

Diners Club is a banking and payment services company owned through subsidiaries of Discover Financial Services. (Doc. 13 at 2–3). It provides financial services

---

[1] "Cybersquatting entails 'registering a domain name associated with a protected trademark either to ransom the domain name to the mark holder or to divert business from the mark holder.'" *Rigsby v. GoDaddy Inc.*, 59 F.4th 998, 1006 (9th Cir. 2023) (quoting *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546, 549 n.3 (9th Cir. 2013)).

to individuals, businesses, and corporations "through channels such as credit and charge card services, and related dining and entertainment rewards." (*Id.* at 3). Plaintiff owns various Diners Club trademarks in the U.S. and U.K. (Doc. 1-1 at 2). "Plaintiff has used its distinctive Diners Club Marks and acquired significant goodwill though their use since the 1960's." (*Id.* ¶ 17).

On November 26, 2021, a website domain was registered through the registrar GoDaddy.com, LLC under the URL "privatedinersclubportal.co.uk" (the "Infringing Domain Name"). (*Id.* ¶ 21). Multiple cease-and-desist letters were sent to Lavang Sheffield, the registrant who operates the website associated with the Infringing Domain Name "in connection with personal chef and catering services." (*Id.* ¶¶ 20–24). Plaintiff alleges that the Infringing Domain Name is confusingly similar to its distinctive Diners Club mark, and that if "an Internet user looking for Plaintiff's website mistakenly enters the Infringing Domain Name as a URL . . . and reaches the Infringing Website," if that user is a prospective customer, "Plaintiff has lost the opportunity to transact business with that user." (*Id.* ¶ 30). Plaintiff alleges that "Lavang Sheffield's registration and use of the Infringing Domain Name is primarily intended to trade off the goodwill associated with Plaintiff's Diners Club Marks," and that the "diversion of users from Plaintiff's website has harmed and continues to harm Plaintiff's ability to generate business and retain customers by misleading internet users attempting to navigate to Plaintiff's website." (*Id.* ¶ 40). Accordingly, Plaintiff sought injunctive relief ordering GoDaddy.com to transfer the Domain Name to Plaintiff. (*Id.* ¶¶ 45–46).

On July 26, 2024, Plaintiff's Motion for Service by Publication was granted. (Doc. 9). Plaintiff served Defendant by publication in *The Guardian* and also mailed hard copies of the Court's July 26 Order to Lavang Sheffield via FedEx. (Doc. 13 at 5). Defendant's response deadline was October 5, 2024, but the date passed without a response ever being filed; accordingly, on November 13, 2024, the Clerk of Court entered default against Defendant. (*Id.*; Doc. 12).

Plaintiff contends that "on or around September 6, 2024, the registrant of the

Infringing Domain Name, in an attempt to evade the jurisdiction of this Court, changed the registrar from GoDaddy Inc. ("GoDaddy" or "Initial Registrar") to eUKhost Ltd. ("eUKhost" or "Current Registrar"), a corporation located in the United Kingdom. (Doc. 13 at 5–6). However, Defendant has not appeared at any point in this case.

## II. DISCUSSION
### a. Subject Matter Jurisdiction, Personal Jurisdiction, and Service of Process

When default judgment is sought against a non-appearing party, a court has "an affirmative duty to look into its jurisdiction over both the subject matter and the parties." *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999) ("To avoid entering a default judgment that can later be successfully attacked as void, a court should determine whether it has the power, i.e., the jurisdiction, to enter judgment in the first place."). A court has a similar duty with respect to service of process. *See Fishman v. AIG Ins. Co.*, 2007 WL 4248867, at *3 (D. Ariz. Nov. 30, 2007) ("Because defendant has not been properly served, the court lacks jurisdiction to consider plaintiff's motions for default judgment."). These considerations are "critical because '[w]ithout a proper basis for jurisdiction, or in the absence of proper service of process, the district court has *no power to render any judgment* against the defendant's person or property unless the defendant has consented to jurisdiction or waived the lack of process.'" *Id.* (citing *S.E.C. v. Ross*, 504 F.3d 1130, 1138–39 (9th Cir. 2007)).

The Court has subject matter jurisdiction because the only claim at issue was brought pursuant to 15 U.S.C. § 1125(d) (the ACPA), and the Court therefore has federal question jurisdiction over the matter. (Doc. 6 at 6); 28 U.S.C. § 1331. The ACPA was passed by Congress in 1999 as an amendment to the Lanham Act, and it was primarily "designed to reach activity that might otherwise fall outside the scope of the Lanham Act, i.e., the bad faith registration of domain names with intent to profit from the goodwill associated with the trademarks of another," also known as "cybersquatting." *Cazorla v. Hughes*, 2014 U.S. Dist. LEXIS 188404, at *23 (C.D. Cal. Apr. 7, 2014) (citing S. Rep.

No. 106-140, at 4 (1999)). The statutory text of the ACPA provides that a trademark owner

> may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located if--
>
>> (i) the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c); and
>>
>> (ii) the court finds that the owner--
>>
>>> (I) is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1); or
>>>
>>> (II) through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1) by--
>>>
>>>> (aa) sending a notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; and
>>>>
>>>> (bb) publishing notice of the action as the court may direct promptly after filing the action.
>
> (B) The actions under subparagraph (A)(ii) shall constitute service of process.
>
> (C) In an in rem action under this paragraph, a domain name shall be deemed to have its situs in the judicial district in which--
>
>> (i) the domain name registrar, registry, or other domain name authority that registered or assigned the domain name is located; or
>>
>> (ii) documents sufficient to establish control and authority regarding the disposition of the registration and use of the domain name are deposited with the court.

15 U.S.C. § 1125(d)(2)(A–C).

Here, the Court finds that it has *in rem* jurisdiction over the Domain Name, "privatedinersclubportal.co.uk," so long as section 1125(d)(2)(A)(i) is satisfied. Plaintiff

stated that it "is unable to obtain *in personam* jurisdiction over the registrant of the Infringing Domain Name, Lavang Sheffield, because Lavang Sheffield is located in England and lacks the requisite minimum contacts with the United States required for *in personam* jurisdiction." (Doc. 13 at 7). Plaintiff sent notice of the alleged violation to Lavang Sheffield via the postal and e-mail addresses provided to Plaintiff by the registrar, as well as publishing notice of the action in *The Guardian*, which constitutes service of process pursuant to section 1125(d)(2)(A)(ii). (*Id.*). At the time the Complaint was filed, the Infringing Domain was registered to GoDaddy.com, LLC, which maintains its principal place of business in the District of Arizona. (Doc. 1 ¶ 6). Another court in this District previously held that the Court's *in rem* jurisdiction over a defendant domain name cannot be defeated by transferring the domain name registration to a foreign registrar before the entry of default judgment. *Friedkin Grp. Inc. v. danfriedkin.com*, 2017 U.S. Dist. LEXIS 175963, at *6 (D. Ariz. Sep. 20, 2017). Although that decision is not binding, this Court agrees with Judge Bade's reasoning, and the reasoning of other circuits, that the purpose of the ACPA—to protect consumers and trademarks by stopping "cybersquatting" — would be frustrated "if registrants could defeat jurisdiction by transferring the registration of an allegedly infringing domain name to a foreign registrar after the filing of an *in rem* action." *Id.* at *10; *see also Porsche Cars N. Am., Inc. v. Porsche.net*, 302 F.3d 248, 258 (4th Cir. 2002).

Accordingly, the only remaining question is whether the allegedly infringing Domain Name indeed violates any right of the Plaintiff. *See* 15 U.S.C. § 1125(d)(2)(A)(i). The Court will consider that question in conjunction with the second *Eitel* factor, which also requires an evaluation of the merits of the claim.

### b.     Default Judgment Analysis: *Eitel* Factors

"A defendant's default does not automatically entitle a plaintiff to a default judgment." *Hartford Life & Accident Ins. Co. v. Gomez*, 2013 WL 5327558, at *2 (D. Ariz. Sept. 24, 2013). Instead, once a default has been entered, the district court has discretion to grant a default judgment. *See* Fed. R. Civ. P. 55(b)(2); *Aldabe v. Aldabe*, 616 F.2d 1089,

1092 (9th Cir. 1980). Factors the Court may consider include: (1) the possibility of prejudice to the plaintiff; (2) the merits of the claim; (3) the sufficiency of the complaint; (4) the amount of money at stake; (5) the possibility of a dispute concerning material facts; (6) whether default was due to excusable neglect; and (7) the policy favoring a decision on the merits (collectively, the "*Eitel* factors"). *See Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986). In applying the *Eitel* factors, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).

i. First, Fourth, Fifth and Sixth *Eitel* Factors

In the present case, the first, fourth, fifth, and sixth *Eitel* factors weigh in favor of granting default judgment. The first factor is the possibility of prejudice to Plaintiff. Defendant has failed to appear in this action, despite having been served in August 2024. (Doc. 10). Because Defendant has both failed to respond and failed to take down the Infringing Domain, Plaintiff's only available recourse is through this litigation. *Zekelman Indus. Inc. v. Marker*, 2020 WL 1495210, at *3 (D. Ariz. Mar. 27, 2020) (citing *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002)); *Whaleco Inc. v. Temuapp.me*, 2024 WL 2804064, at *4 (D. Ariz. May 31, 2024) ("Due to Defendant registrants' failure to take down the websites, and their failure to respond to [Plaintiff's] Complaint, the only appropriate recourse [Plaintiff] has is through litigation and this Motion."). The first factor therefore weighs in favor of granting default judgment.

Under the fourth factor, this Court "must consider the amount of money at stake in relation to the seriousness of Defendant's conduct." *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 500 (C.D. Cal. 2003). "When the money at stake in the litigation is substantial or unreasonable, default judgment is discouraged." *Zekelman*, 2020 WL 1495210, at *4 (internal quotations omitted) (citation omitted). Here, Plaintiff does not seek monetary damages, but rather declaratory and injunctive relief from Defendant's use of the Infringing Domain Name. (Doc. 1 at 7–8). The only monetary relief sought by Plaintiff is for "an award of costs and reasonable attorney's fees." (*Id.* at 8). Accordingly,

the fourth factor weighs in favor of default judgment. *See Whaleco Inc. v. Temureviewer.com*, 2024 WL 1533489, at *9 (D. Ariz. Apr. 9, 2024).

The fifth *Eitel* factor—the possibility of factual disputes—necessarily weighs in favor of Plaintiff because Defendant's "failure to participate means there are no disputed material facts." *PragmaticPlay*, 2024 WL 113306, at *4. Finally, the sixth factor, whether default was due to excusable neglect, weighs slightly in favor of granting default judgment. Because the service was effectuated on Defendant via mail and email to the registrant of the Infringing Domain Name, as well as service by publication, and given that there is some evidence Defendant may have changed the registry for the Infringing Domain Name specifically to evade jurisdiction (Doc. 13 at 5–6, 8), the Court finds it unlikely that Defendants' failure to appear and the resulting default was the result of excusable neglect.

### ii. Second, Third, and Seventh *Eitel* Factors

The remaining *Eitel* factors all weigh in favor of denying default judgment. The second and third factors—the merits of the claims and the sufficiency of the Complaint— "are often analyzed together and require courts to consider whether a plaintiff has stated a claim on which it may recover." *Zekelman*, 2020 WL 1495210, at *5 (citation omitted). When the complaint sufficiently states a claim for relief, these factors favor a default judgment. *See Danning v. Lavine*, 572 F.2d 1386, 1388–89 (9th Cir. 1978). "Of all the *Eitel* factors, courts often consider the second and third factors to be the most important." *Zekelman*, 2020 WL 1495210, at *5 (citation omitted).

"In reviewing a default judgment, this court takes 'the well-pleaded factual allegations' in the complaint 'as true.'" *DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) (quoting *Cripps v. Life Ins. Co. of North America*, 980 F.2d 1261, 1267 (9th Cir.1992)). "However, a 'defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.'" *Id.* (quoting N*ishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1975)). Here, this Court finds that the Complaint fails to state a claim for relief against Defendants for a violation of the Anticybersquatting Consumer Protection Act, as the Complaint is rife with legal conclusions unsupported by factual

7

allegations.

To state a claim under the ACPA, Plaintiff must establish that "(1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted with bad faith intent to profit from that mark." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010) (internal quotation marks omitted); *see also Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005). First, Plaintiff demonstrated that Defendant registered and used the Infringing Domain Name, easily satisfying the first element of the claim. (Doc. 1 ¶¶ 21–22). As to the second element, Plaintiff argues that the Infringing Domain "privatedinersclubportal.co.uk" is confusingly similar to its protected Diners Club mark. (*Id.* ¶ 26). "In determining whether there is confusing similarity under the ACPA, courts compare the plaintiff's mark with the name of the website." *Super-Krete Int'l, Inc. v. Sadleir*, 712 F. Supp. 2d 1023, 1031 (C.D. Cal. 2010). The Court may not look beyond the domain name to the content of the website; "[c]onsequently, even if it might be evident from the content of the website that it is not sponsored by or affiliated with the plaintiff, there may nonetheless be a violation of the ACPA." *Id.* at 1031–32. The question here is whether the Infringing Domain Name, "privatedinersclub.co.uk," is confusingly similar to the "Diners Club" mark.

In other cybersquatting cases brought under the ACPA, it has been established that addition of a top-level domain suffix to a protected mark is irrelevant. *See, e.g.*, *Temuapp.me*, 2024 WL 2804064, at *8 (finding additions of "app," "me," and "space" to a domain name irrelevant); *Wavve Americas Inc. v. Max*, 2024 WL 455098, at *8 (D. Ariz. Feb. 6, 2024) (finding an alteration in spelling and the addition of "TV" irrelevant); *beIN Media Grp. LLC v. bein.ae*, 2019 WL 1129153, at *5 (S.D. Cal. Mar. 11, 2019) (finding the addition of suffixes "ae" "hk" "jp" or "xyx" or the word "work" irrelevant). Here, the suffixes ".co" and ".uk" are clearly irrelevant; however, it is less clear whether the addition of "private" and "portal" render the Infringing Domain Name sufficiently distinct from the protected "Diners Club" mark.

On one hand, the Infringing Domain Name incorporates the "Diners Club" mark in its entirety, which weighs toward a finding that the Infringing Domain Name is confusingly similar to the mark. *See Friedkin*, 2017 U.S. Dist. LEXIS 130714, at *18 (collecting cases); *see also PragmaticPlay Int'l Ltd. v. Agenpragmaticplay.live*, 2024 WL 113306, at *6 (D. Ariz. Jan. 10, 2024) (finding that addition of descriptive elements to domain name, such as "demo" or "game," did not serve to distinguish infringing domain names from plaintiff's mark); *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007) (in the context of a trademark infringement claim, finding the domain name "perfumebay.com" adequately similar to "eBay" because it incorporates the mark in its entirety). However, while the addition of "portal" to the domain name could likely be considered a mere descriptive element that fails to distinguish the Infringing Domain Name from the protected mark, the addition of "private" could arguably change the meaning of the phrase, as the focus on "private diners" as opposed to the "diners club" may help to distinguish the Infringing Domain Name from Plaintiff's mark.

Ultimately, the Court need not reach a conclusion regarding the similarity of the Infringing Domain Name to the mark, because Plaintiff has failed to establish the third and final element of an ACPA claim, which requires a showing that Defendant acted with bad faith intent to profit from the Diners Club mark. *See DSPT Int'l*, 624 F.3d at 1219. There are "nine nonexclusive factors for courts to consider in determining whether bad faith exists." *Lahoti v. VeriCheck*, Inc., 586 F.3d 1190, 1202 (9th Cir. 2009). Plaintiff only addresses four of the nine bad faith factors, arguing that each weighs toward a finding of bad faith. (Doc. 13 at 12–13). First, Plaintiff argues that "the Infringing Domain Name does not reflect the trademark or intellectual property rights of the registrant." (*Id.* at 12). Next, "the Infringing Domain Name does not reflect the legal name of the registrant," Lavang Sheffield. (*Id.* at 13). Third, they argue that "the registrant has demonstrated an intent to divert customers from the legitimate Diners Club online location in such a way that could harm the goodwill of the Diners Club Mark." (*Id.*). This allegation, however, is a bare legal conclusion, as Plaintiff has not presented any independent evidence that Defendant

9

intended to divert customers from a legitimate Diners Club website. Finally, Plaintiff argues that "the contact information for the registrant of the Infringing Domain Name is materially misleading because it conceals the identity of the true owner of the domain name." (*Id.*). Specifically, Plaintiff notes that the registration record of the Infringing Domain Name listed the registrant's name as "Redacted for Privacy." (Doc. 8-1 at 2).

While some of the bad faith factors weigh in Plaintiff's favor, others do not. The Court notes that "there is no evidence in this case of traditional cybersquatting," i.e., there is no evidence that Defendant has made any attempt to sell the Infringing Domain Name to Plaintiff for profit. *Aviva USA Corp. v. Vazirani*, 902 F. Supp. 2d 1246, 1266 (D. Ariz. 2012), *aff'd*, 632 F. App'x 885 (9th Cir. 2015). In other ACPA cases, a registrant often obtains numerous domain names, all with similarities to a given mark, in an attempt to confuse and divert customers from the mark holder's legitimate online location. *See, e.g.*, *PragmaticPlay*, 2024 WL 113306, at *6. Here, however, there is no evidence that Defendant registered more than one domain name using the mark, and there is simply no evidence in this case that Defendant had any intent to divert Plaintiff's banking and financial customers to its website offering private chef services. *Cf. United Biomedical Inc. v. ubi-group.global*, 2024 WL 2923721, at *4 (D. Ariz. June 10, 2024) ("Moreover, based on Defendant's noticeable mimicry of Plaintiff's website, the Court presumes Defendant's intent is to divert consumers away from Plaintiff's online location.").

Finally, the seventh factor—the policy favoring a decision on the merits—generally weighs in favor of denying default judgment because "[c]ases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. Ultimately, because the second and third *Eitel* factors have not been met, this Court will deny the motion for default judgment. *See GS Holistic, LLC v. Ravens Smoke Shop*, Inc., 2023 WL 5504964, at *3 (C.D. Cal. July 10, 2023) ("[T]he Court may render judgment based on an assessment of the second and third *Eitel* factors alone."). Because Plaintiff's Complaint is composed of more legal conclusions than facts, the Court simply "cannot conclude that the sufficiency of the Complaint and/or merits of the claims weigh in favor of granting default judgment."

*Id.* at *5.

### c. Relief Sought

Even if this Court had granted default judgment, it notes that Plaintiff has not established, as a practical matter, whether the Court has jurisdiction to provide Plaintiff's requested injunctive relief. The ACPA provides that the "remedies in an in rem action . . . shall be limited to a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(2)(D)(i). Plaintiff therefore requests that the Infringing Domain Name be transferred to Plaintiff. (Doc. 13 at 13). However, because registration of the Infringing Domain Name was transferred from GoDaddy.com, a U.S.-based registrar, to eUKhost Ltd., a U.K.-based registrar, Plaintiff requests that the Court order Nominet US (a wholly-owned subsidiary corporation of Nominet UK, which is the domain name registry[2] for the Infringing Domain Name) "to change the registrar of record for the Infringing Domain Name to Plaintiff's domain name registrar of choice, and for that registrar to take all necessary steps to update the registrant for the Infringing Domain Name as directed by Plaintiff." (*Id.*). However, it is far from clear that this Court has the authority to order Nominet US, a subsidiary company of the domain name registry, to change the registration of the Infringing Domain Name. *See Globalsantafe Corp.*, 250 F. Supp. 2d at 624 (predicting that "a desire to avoid United States jurisdiction may cause foreign registrants to choose to use domain names within their respective country code top-level domains, whose registries are located in and operated by the foreign countries . . . . The result may be an increasing number of domain names registered out of the reach of United States jurisdiction, but accessible to United States users through the universal domain name system, which in turn will pose a serious challenge to the enforcement of United States trademark rights on the Internet.").

---

[2] Domain name registrars "handle the retail side of domain name registration, selling domain names to individual domain name registrants," while the registry "performs a central but more limited function, namely maintaining and operating the unified Registry Database, which contains all domain names registered by all registrants and registrars in a given top level domain . . . ." *Globalsantafe Corp. v. Globalsantafe.Com*, 250 F. Supp. 2d 610, 619 (E.D. Va. 2003).

### III. CONCLUSION

Given Plaintiff's failure to show how the Complaint sufficiently establishes the necessary facts to support its ACPA claim against Defendant, the motion for default judgment will be denied. However, Plaintiff shall be afforded an opportunity to refile the motion. The new motion must provide factual allegations to support Plaintiff's legal assertions regarding Defendant's "intent to divert customers from the legitimate Diners Club online location in such a way that could harm the goodwill of the Diners Club Mark" (Doc. 13 at 13). Additionally, Plaintiff should explain how this Court may practically effectuate transfer of the Infringing Domain Name, given that both the domain name registrar and the domain name registry are currently located outside the reach of United States jurisdiction. Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Default Judgment (Doc. 13) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiff may file a second motion for default judgment within thirty (30) days of entry of this order.

Dated this 21st day of February, 2025.

Honorable Steven P. Logan
United States District Judge