**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Diners Club International Limited,<br><br>                    Plaintiff,<br><br>vs.<br><br>privatedinersclubportal.co.uk,<br><br>                    Defendant. | No. CV-24-01559-PHX-SPL<br><br>**ORDER** |

Before the Court is Plaintiff's Amended Motion for Default Judgment (Doc. 16). For the following reasons, the Court will grant the motion.

### I. BACKGROUND

The Court incorporates the background facts it summarized in its February 24, 2025 Order (Doc. 15) denying Plaintiff's initial Motion for Default Judgment (Doc. 13). In pertinent part, Plaintiff Diners Club International Limited ("Plaintiff") brought this action against the domain name "privatedinersclubportal.co.uk" ("Defendant" or "Domain Name") under the *in rem* provisions of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) (the "ACPA"), alleging that the Domain Name infringes Plaintiff's distinctive Diners Club trademarks and therefore violates the ACPA. (*See generally* Doc. 1). On November 13, 2024, the Clerk of Court entered default against Defendant, as it has not appeared at any point in this case. (Doc. 12).

### II. DISCUSSION

In its February 24, 2025 Order (Doc. 15), this Court found that it had both subject

matter jurisdiction over this case and *in rem* jurisdiction over the Domain Name. (Doc. 15 at 3–5). The Court therefore stated that "the only remaining question is whether the allegedly infringing Domain Name indeed violates any right of the Plaintiff" under the ACPA. (*Id.* at 5).

The Court analyzed the seven *Eitel* factors in determining whether it was appropriate to grant default judgment. (*Id.* at 5–10). It concluded that the first, fourth, fifth, and sixth *Eitel* factors weighed in favor of granting default judgment, which remains true. (*Id.* at 6). However, it found that the second, third, and seventh *Eitel* factors weighed against granting default judgment. (*Id.* at 7). The seventh *Eitel* factor, the policy favoring a decision on the merits, necessarily weighs against the entry of default judgment. *See Eitel v. McCool*, 782 F.2d 1470, 1472 ("Cases should be decided upon their merits whenever reasonably possible."). However, in light of the Amended Motion for Default Judgment, the Court will reconsider its analysis of the second and third *Eitel* factors as applied to this case.

### A. Second and Third *Eitel* Factors

As this Court explained in its previous Order (Doc. 15 at 7), the second and third *Eitel* factors—the merits of the claims and the sufficiency of the Complaint— "are often analyzed together and require courts to consider whether a plaintiff has stated a claim on which it may recover." *Zekelman Indus. Inc. v. Marker*, 2020 WL 1495210, at *5 (D. Ariz. Mar. 27, 2020) (citation omitted). To state a claim under the ACPA, Plaintiff must show that "(1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted with bad faith intent to profit from that mark." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010) (internal quotation marks omitted); *see also Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005). The Court found that Plaintiff satisfied the first element of the claim (Doc. 15 at 8), but as to the second element, the Court found that it was unclear "whether the addition of 'private' and 'portal' render the Infringing Domain Name sufficiently distinct from the protected 'Diners Club'

mark." (*Id.*). However, the Court did not need to reach a conclusion on the second element "because Plaintiff [] failed to establish the third and final element of an ACPA claim, which requires a showing that Defendant acted with bad faith intent to profit from the Diners Club mark." (*Id.* at 9).

The Court can now conclude, based on the additional arguments provided by Plaintiff in its Amended Motion, that the Domain Name is confusingly similar to Plaintiff's protected Diners Club marks. The Court previously noted that "the Infringing Domain Name incorporates the 'Diners Club' mark in its entirety, which weighs toward a finding that the Infringing Domain Name is confusingly similar to the mark." (*Id.*). However, it sought clarification as to whether the addition of the terms "private" and "portal" to the domain name "privatedinersclubportal.co.uk" distinguishes it from Plaintiff's marks. (*Id.* at 8). In its Amended Motion, Plaintiff clarifies that the term "private" is "commonly used [] in the financial sector services industry," and as such, it "does not change the meaning of the phrase to focus on 'private diners' rather than 'diners club.'" (Doc. 16 at 13). Additionally, it notes that the "United States Patent and Trademark Office considers the term 'private' to be descriptive in relation to financial services, and it consequently requires trademark owners to disclaim 'private' in relation to their trademark registrations." (*Id.* at 14). This supports Plaintiff's argument that "private" is a mere descriptive element tacked on to the "Diners Club" mark. The Court has already noted that the addition of the word "portal" is "a mere descriptive element that fails to distinguish the Infringing Domain Name from the protected Mark." (Doc. 15 at 9). Accordingly, the Court finds that the Domain Name is confusingly similar to the Diners Club marks, which satisfies the second element required for Plaintiff to state an ACPA claim. *See, e.g.*, *PragmaticPlay Int'l Ltd. v. Agenpragmaticplay.live*, 2024 WL 113306, at *6 (D. Ariz. Jan. 10, 2024) (finding the addition of descriptive elements to domain name, such as "demo" or "game," did not serve to distinguish infringing domain names from plaintiff's mark).

As to the third element of an ACPA claim—bad faith—there are "nine nonexclusive factors for courts to consider in determining whether bad faith exists." *Lahoti v. VeriCheck*,

Inc., 586 F.3d 1190, 1202 (9th Cir. 2009). Plaintiff only addressed four of the nine factors in its initial Motion for Default Judgment. (*See* Doc. 13 at 12–13). The Court noted that there was "no evidence that Defendant has made any attempt to sell the Infringing Domain Name to Plaintiff for profit." (Doc. 15 at 10 (citing *Aviva USA Corp. v. Vazirani*, 902 F. Supp. 2d 1246, 1266 (D. Ariz. 2012), *aff'd*, 632 F. App'x 885 (9th Cir. 2015))). In its Amended Motion, however, Plaintiff provides evidence that "the registrant demonstrated its bad faith intent by demanding $45,000.00 to stop using the Diners Club Mark and to transfer the Infringing Domain Name to Plaintiff." (Doc. 16 at 16; Doc. 16-1 ¶ 15). The Court cannot declare with certainty that this is traditional cybersquatting, as it appears that the $45,000.00 demand was part of a potential settlement negotiation. (*See* Doc. 16-1 at 210–14). However, it does provide some evidence that Defendant may be acting with bad faith in its continued use of the Diners Club mark. Even if Defendant initially registered the Domain Name for a legitimate business purpose, if it is *now* attempting to profit off its use of Plaintiff's marks, the Ninth Circuit has noted that "[e]vidence of bad faith may arise well after registration of the domain name." *Lahoti*, 586 F.3d at 1202.

Plaintiff also provides more support for its assertion that Defendant intends to divert customers from the legitimate Diners Club website for commercial gain. (*See* Doc. 16 at 15). It argues that "the website associated with the Infringing Domain Name does nothing to dispel a likelihood of confusion" because it does not contain a disclaimer or branding with the owner's name. (*Id.*); *see also MGM Resorts Int'l v. Unknown Registrant of www.imgmcasino.com*, 2015 WL 5674374, at *11 (D. Nev. July 8, 2015), *report and recommendation adopted*, 2015 WL 5682783 (D. Nev. Sept. 23, 2015) (finding the defendant's "intent to divert consumers [] apparent" where the domain name "strongly suggests the website is sponsored or endorsed by [the plaintiff] because it contains [the plaintiff's] mark and name"); *cf. Nissan Motor Co. v. Nissan Comput. Corp.*, 2002 U.S. Dist. LEXIS 6488, at *16 (C.D. Cal. Jan. 7, 2002).

Perhaps if Defendant had appeared in this action, it would have been able to show that it registered the Domain Name in good faith, for a legitimate business purpose, and

without any knowledge of the Domain Name's similarity to Plaintiff's protected marks. *See* 15 U.S.C. § 1125(d)(1)(B)(ii) ("Bad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."). However, Defendant did not appear. Given that the Court has discretion to weigh the bad faith factors without "march[ing] through the nine factors seriatim," the Court finds that under the circumstances of this case, Plaintiff has made the requisite showing that Defendant acted with bad faith intent to profit from the Diners Club mark. *See Lahoti*, 586 F.3d at 1201 (quoting *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269 (4th Cir. 2001)). Thus, Plaintiff has stated a claim under the ACPA, and the Court finds that the second and third *Eitel* factors therefore weigh in favor of granting default judgment.

### B. Relief Sought

In its February 24 Order, the Court also noted that Plaintiff failed to explain how the Court possessed "the authority to order Nominet US, a subsidiary company of the [UK-based] domain name registry, to change the registration of the Infringing Domain Name." (Doc. 15 at 11). In its Amended Motion, Plaintiff sets forth an affidavit from Nominet UK's General Counsel stating that "Nominet US, Inc. is a wholly owned subsidiary of Nominet UK," and that a "court order instructing Nominet US Inc. to transfer a domain name will be adhered to by Nominet UK." (Doc. 16-1 at 7). This will allow the Court to enforce Plaintiff's ACPA rights despite Defendant's alleged attempt to "evade the jurisdiction of this Court" by changing the registrar of the Domain Name. (Doc. 16 at 5).

### III. CONCLUSION

Because Plaintiff has bolstered its arguments regarding the elements required to state an ACPA claim, the Court now finds that nearly all of the *Eitel* factors weigh in favor of granting default judgment, and it will be granted. As relief, Plaintiff seeks the transfer of the Domain Name to itself. (Doc. 16 at 16); 15 U.S.C. § 1125(d)(1)(C) ("In any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order . . . the transfer of the domain name to the owner of the mark.").

Accordingly,

**IT IS ORDERED** that Plaintiff's Amended Motion for Default Judgment (Doc. 16) is **granted**. The Clerk of Court is directed to enter judgment in favor of Plaintiff Diners Club International Limited and **terminate** this action.

**IT IS FURTHER ORDERED** that Nominet US Inc. shall change the registrar of record for the Domain Name ("privatedinersclubportal.co.uk") to the Plaintiff's domain name registrar of choice, Corporation Service Company; and

**IT IS FURTHER ORDERED** that Corporation Service Company shall take all necessary steps to have Plaintiff Diners Club International Limited listed as the registrant for the Domain Name ("privatedinersclubportal.co.uk").

Dated this 27th day of March, 2025.

Honorable Steven P. Logan
United States District Judge